# Fay v. Thiel College

C.P. of Mercer County, no. 1998-2227.

*Mark J. Krauland* and *Russell G. Roll,* for plaintiff.
*Paul E. Pongrace III,* for defendants.

WHERRY, *J.,* December 31, 2001—This matter is before this court pursuant to defendants' motion for summary judgment. For the reasons set forth below, this court shall deny defendants' motion for summary judgment.

## I. FACTUAL BACKGROUND

This lawsuit centers around injuries suffered by plaintiff Amy Fay while attending a study abroad trip to Peru sponsored by Thiel College. At the time that plaintiff participated in the Thiel-sponsored trip to Peru, plaintiff was a full-time college student at Thiel College. The trip was supervised by three faculty members—Curtis Thompson, professor of religion; Brenda Brasher, professor of religion; and Barbara Heming, professor of

language (the faculty supervisors). The trip took place in May of 1996, after the completion of the spring semester of the 1995-1996 school year. The trip to Peru was offered and sponsored by Thiel College in conjunction with a class taught by Professor Thompson entitled "Liberation theology in a Peruvian context." Most of the students who went on the trip to Peru, including plaintiff, were enrolled in Professor Thompson's course. The purpose of the three-week trip to Peru was to see and experience first hand liberation theology in practice.

Prior to departing on the trip to Peru, plaintiff was required by Thiel College to sign certain documents germane to defendants' motion for summary judgment, namely a "Waiver of Liability" form and a "Thiel College consent form." The waiver of liability form was executed by plaintiff on April 18, 1996, and the consent form was executed by plaintiff on April 26, 1996. All students attending the trip to Peru were required by Thiel College to execute both documents. It is undisputed that if a student would have refused to sign one or both of the documents, Thiel College would not have permitted that student to go on the trip to Peru.

During the trip plaintiff became ill. She was taken to a medical clinic located in the city of Cuzco, where she was eventually admitted. After plaintiff was admitted to the medical clinic, all of the faculty supervisors and all of the other students left on a prescheduled trip that was to last several days, leaving plaintiff alone at the clinic with only a Lutheran missionary by the name of Karen Helikson to act as plaintiff's translator.[1] Plaintiff had only

---

1. The primary language of Peru is Spanish. Plaintiff spoke a little Spanish, but was not fluent in Spanish.

met Ms. Helikson while in Peru. Ms. Helikson was not in any way related to Thiel College and was not in any way acting as an agent and/or representative of Thiel College.

During plaintiff's stay in the Peruvian medical clinic and during the absence of any of the faculty supervisors, plaintiff was subjected to the unnecessary surgical removal of her appendix. After plaintiff was informed, through translation by Ms. Helikson, that the doctor would be removing her appendix, plaintiff went through a list of alternatives—plaintiff asked if the surgery was absolutely necessary; plaintiff asked to be transferred to a hospital in Lima; plaintiff asked to fly home; plaintiff asked to call her parents in the United States prior to the surgery. After all of her requests were denied, plaintiff was then reluctantly prepared for surgery. The appendectomy was apparently authorized by Ms. Helikson— who, once again, was a Lutheran missionary who was not in any way related to Thiel College or acting as an agent and/or representative of Thiel College. Ms. Helikson requested to observe plaintiff's surgical procedure from the viewing room, but was not permitted to do so. After her appendectomy was completed, plaintiff was sexually assaulted by the same surgeon who had performed the surgery and the same anesthesiologist who had administered the anesthesia—both of whom were men.[2]

---

2. Plaintiff knows that she was sexually assaulted because she was fully conscious during and after her surgery. The anesthesiologist gave plaintiff some type of a local anesthetic, rather than a general anesthetic.

## II. STANDARD OF REVIEW

The standard of review in deciding a motion for summary judgment is as follows:

"Summary judgment is properly granted where 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.' Pa.R.C.P. 1035(b). 'The record must be viewed in the light most favorable to the nonmoving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.' . . . Summary judgment may be entered only in those cases where the right is clear and free from doubt." *Pennsylvania State University v. County of Centre*, 532 Pa. 142, 144-45, 615 A.2d 303, 304 (1992). (citations omitted)

## III. DISCUSSION

### A. *The Exculpatory Clause Contained in the Waiver of Liability Form Is Not Valid*

Defendants first contend that judgment should be entered in their favor because, by signing the waiver of liability form, plaintiff waived any and all claims against defendants arising out of or in connection with plaintiff's participation in the study abroad trip to Peru. The relevant exculpatory language in the waiver of liability form is as follows:

"As a condition of my participation in the study or project, I understand and agree that I am hereby waiving

any and all claims arising out of or in connection with my travel to and from and/or my participation in this project or study that I, my family, my heirs or my assigns may otherwise have against Thiel College and/or its personnel." See waiver of liability form, exhibit A to defendants' brief in support of motion for summary judgment.

In *Employers Liability Assurance Corp. v. Greenville Business Men's Association,* 423 Pa. 288, 224 A.2d 620 (1966), the Pennsylvania Supreme Court set forth the following standard for determining the validity and enforceability of an exculpatory clause:

"Generally speaking, an exculpatory clause is valid if: (a) 'it does not contravene any policy of the law, that is, if it is not a matter of interest to the public or State . . . .'; (b) '[the contract is] between persons relating entirely to their own private affairs'; (c) 'each party is a free bargaining agent' and the clause is not in effect 'a mere contract of adhesion, whereby [one party] simply adheres to a document which he is powerless to alter, having no alternative other than to reject the transaction entirely.'

"Assuming . . . that the . . . exculpatory clause satisfies all three conditions and is valid, our case law requires that, even if valid, an exculpatory clause must meet certain standards. 'Despite the general *validity* of exculpatory provisions, certain standards have been established which must be met before an exculpatory provision will be interpreted and construed to relieve a person of liability for his own or his servants' acts of negligence.'

"Such standards are: (1) contracts providing for immunity from liability for negligence must be construed strictly since they are not favorites of the law; (2) such contracts 'must spell out the intention of the parties with the greatest of particularity' and show the intent to release from liability 'beyond doubt by express stipulation' and '[n]o inference from words of general import can establish it'; (3) such contracts must be construed with every intendment against the party who seeks the immunity from liability; (4) the burden to establish immunity from liability is upon the party who asserts such immunity." *Id.* at 291-93, 224 A.2d at 622-23. (citations omitted) (emphasis in original)

With respect to the third requirement, *i.e.,* that the contract is not, in effect, a contract of adhesion,

"[A]n adhesion contract is a 'standardized contract form offered to consumers of goods and services on [an] essentially "take it or leave it" basis without affording [the] consumer a realistic opportunity to bargain and under such conditions that [the] consumer cannot obtain [the] desired product or services except by acquiescing [to the] form contract.' . . . The fundamental nature of this type of contract is such that the consumer who is presented with it has no choice but to either accept the terms of the document as they are written or reject the transaction entirely." *Todd Heller Inc. v. United Parcel Service Inc.,* 754 A.2d 689, 700 (Pa. Super. 2000) (quoting *Denlinger Inc. v. Dendler,* 415 Pa. Super. 164, 174-75, 608 A.2d 1061,1066 (1992) (quoting Black's Law Dictionary (5th ed. 1979))). (citations omitted)

In the present case, Professor Thompson testified that Thiel College insisted that the students going on the Thiel-sponsored trip to Peru sign both the waiver of liability form and the consent form. See deposition of Curtis Thompson at p. 20, lines 8-13. Professor Thompson testified that, if a student did not sign or refused to sign the necessary forms, that student would not have been permitted to go on the trip to Peru. See deposition of Curtis Thompson at p. 20, lines 8-13. In addition, plaintiff testified that, to her knowledge, every student that participated in the Thiel-sponsored trip to Peru was required to sign both the waiver of liability form and the consent form. See deposition of Amy Fay at p. 24, lines 7-9. Finally, Dr. Richard H. Rugen, the vice-president of administrative services at Thiel College, stated that "Thiel College required the students taking part in the study abroad trip to Peru in May of 1996 to sign what was entitled the 'Waiver of Liability' form." See affidavit of Dr. Richard H. Rugen, exhibit B to defendants' brief in support of motion for summary judgment.

Both plaintiff and defendants agree that the waiver of liability form was presented to plaintiff on a take-it-or-leave-it basis, *i.e.,* plaintiff either signed the form or she did not go on the Thiel-sponsored trip to Peru. The terms of the waiver of liability form were not bargained for by plaintiff and, in fact, plaintiff had no choice in its terms and provisions. Plaintiff simply executed the waiver of liability form, which she was powerless to alter, because she was told that she had to sign that form in order to go on the study abroad trip to Peru. Because rejecting the transaction entirely was plaintiff's only option other than accepting the contract with the exculpatory clause, this

court finds that the subject waiver of liability form is a contract of adhesion. Based upon that finding, this court concludes that the exculpatory clause contained in the waiver of liability form is not valid in that it fails to satisfy one of the three requirements for the validity of such a clause. See *e.g., Garbish v. Malvern Federal Savings and Loan Association,* 358 Pa. Super. 282, 302, 517 A.2d 547, 557 (1986) (court found that contract containing the exculpatory clauses was a contract of adhesion and, thus, concluded that the exculpatory clauses contained therein were not valid).

### B. *Defendants Owed Plaintiff a Special Duty Pursuant to the Consent Form That Plaintiff Was Required to Execute in Order to Attend the Thiel-Sponsored Study Abroad Trip to Peru*

Defendants contend that they had no special relationship with plaintiff beyond the fact that plaintiff was a student at Thiel College. Defendants go on to argue that, since there was no special relationship between the parties, defendants owed plaintiff no special duty beyond that of a reasonable standard of care, and that defendants did not violate that reasonable standard of care in leaving plaintiff alone at the Peruvian medical clinic while the rest of the group continued on with the prearranged travel itinerary.

Plaintiff, on the other hand, contends that (1) the consent form created a special relationship between defendants and plaintiff, and (2) pursuant to that special relationship, defendants owed a duty to plaintiff to secure, in the event of her sickness or injury, "whatever treatment is deemed necessary, including the administration

of an anesthetic and surgery." See consent form, exhibit D to defendants' brief in support of motion for summary judgment. Plaintiff goes on to argue that (1) pursuant to that duty, one or more of the faculty supervisors should have stayed with plaintiff during her stay at the Peruvian medical clinic, and (2) defendants breached that duty by "abandoning" her in the Peruvian medical clinic. In the alternative, plaintiff argues that, even if no special relationship existed between plaintiff and defendants as a result of the consent form, defendants owed plaintiff a duty to act reasonably under the circumstances, which duty defendants breached in abandoning plaintiff at the Peruvian medical clinic.

Whether a defendant owes a duty of care to a plaintiff is a question of law. *Morena v. South Hills Health System,* 501 Pa. 634, 642 n.5, 462 A.2d 680, 684 n.5 (1983). See also, *Kleinknecht v. Gettysburg College,* 989 F.2d 1360, 1366 (3d Cir. 1993). The Pennsylvania Supreme Court has stated that "[d]uty, in any given situation, is predicated on the relationship existing between the parties at the relevant time . . . ." *Morena,* 501 Pa. at 642, 462 A.2d at 684.

Although it is true that a college does not owe its students an in loco parentis duty simply because of the college/student relationship, *Alumni Association v. Sullivan,* 524 Pa. 356, 364, 572 A.2d 1209, 1213 (1990) (court refused to impose liability upon the university for the negligent acts of one its students, who had committed those acts after becoming intoxicated at a fraternity party where he had been openly served alcohol even though he was underage), it is also true that a college can owe a particular student a special duty as a result of a special

relationship that exists between the college and that particular student. *Kleinknecht v. Gettysburg College,* 989 F.2d at 1366-69 (court predicted that the Supreme Court of Pennsylvania would hold that the college owed the student a duty of care in his capacity as an intercollegiate athlete engaged in school sponsored intercollegiate athletic activity for which he had been recruited). In *Alumni Association,* the court refused to impose liability upon the university for the negligent acts of its students. In the present case, however, unlike the *Alumni Association* case, Thiel College and its employees are asking this court to absolve them of liability for their own allegedly negligent acts—*not* for the allegedly negligent acts of their students.

After carefully reviewing all of the evidence of record, this court concludes as a matter of law that Thiel College did owe plaintiff a special duty of care as a result of the special relationship that arose between Thiel College and plaintiff pursuant to the consent form that she was required to execute prior to participating in the Thiel-sponsored trip to Peru. Pursuant to the consent form, and in the event that plaintiff became sick or injured, the faculty supervisors had a duty to "secure whatever treatment is deemed necessary, including the administration of an anesthetic and surgery." See consent form, exhibit D to defendants' brief in support of motion for summary judgment.

Defendants argue that, even if they owed a duty to plaintiff as a result of a special relationship created pursuant to the consent form, they fulfilled that duty by making sure that plaintiff was taken to a Peruvian medical clinic. Plaintiff, on the other hand, argues that defen-

dants were obligated at a minimum to make sure that at least one of the faculty supervisors was physically present with plaintiff at the Peruvian medical clinic while she was admitted therein. This court, however, need not decide that issue because the determination of whether defendants breached the duty of care that they owed to plaintiff is, of course, a question of fact for the jury.

### C. *Defendants Can Be Liable for Breaching Their Special Duty to Plaintiff Created Through the Consent Form*

Next, defendants contend that judgment should be entered in their favor because defendants cannot be liable for the unforeseeable sexual assault and/or medical malpractice of the Peruvian medical staff. Defendants argue that, because it is uncontroverted that the surgery and the sexual assault took place in the operating room, which was separate and apart from the common areas in the clinic and which was kept private from the general public, plaintiff will be unable to prove that the presence of one of more of the faculty supervisors would have prevented the medical malpractice and/or the sexual assault. In addition to their factual argument, defendants contend, in essence, that even if the facts supported a finding that defendants were negligent, the acts of the Peruvian doctors superseded and thus negated the negligence of defendants. See Restatement (Second) of Torts §448 (1965).

In response, plaintiff relies upon section 323 of the Restatement (Second) of Torts, entitled "Negligent performance of undertaking to render services," which provides as follows:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

"(a) his failure to exercise such care increases the risk of such harm, or

"(b) the harm is suffered because of the other's reliance upon the undertaking." See Restatement (Second) of Torts §323 (1965).

Section 323(a) of the Restatement (Second) of Torts has long been recognized as part of the law of Pennsylvania. *Jones v. Montefiore Hospital,* 494 Pa. 410, 416, 431 A.2d 920, 923 (1981). See also, *Hamil v. Bashline,* 481 Pa. 256, 268-69, 392 A.2d 1280, 1286 (1978). Based upon that section of the Restatement (Second) of Torts, plaintiff argues that in light of the consent form, defendants undertook an obligation to see to the welfare of plaintiff, and defendants performed said obligation in a negligent manner. Plaintiff contends that, had one or more of the faculty supervisors been present at the Peruvian medical clinic when the surgery took place, the Peruvian doctors would not have performed the unnecessary surgery and/or would not have committed the sexual assault.

The effect of section 323(a) of the Restatement (Second) of Torts is "to relax the degree of certainty ordinarily required of a plaintiff's evidence to provide a basis upon which a jury may find causation." *Jones,* 494 Pa. at 416, 431 A.2d at 923. Stated more succinctly, sec-

tion 323(a) was intended to relax a plaintiff's burden of proving causation. In the present case, therefore, plaintiff's burden under section 323(a) is to prove that defendants' negligence increased the risk of harm to plaintiff and that such increased risk of harm was a substantial factor in bringing about the harm actually inflicted upon plaintiff. Contrary to the position set forth by defendants in their brief, plaintiff need not prove that, had one or more of the faculty supervisors been physically present with plaintiff at the Peruvian medical clinic, the unnecessary surgery and/or sexual assault would have been prevented. That is a much greater burden than section 323(a) requires.

Whether the lack of the presence of one or more of the faculty supervisors increased the risk of harm to plaintiff is a genuine issue of material fact. The mere fact that the operating room (like most operating rooms) was private and not open to the public does not as a matter of law preclude a jury from finding that the lack of the presence of one or more of the faculty supervisors with plaintiff at the Peruvian medical clinic increased the risk of the male Peruvian doctors unnecessarily performing surgery on plaintiff and/or sexually assaulting plaintiff. Moreover, discovery in this case is not yet complete. Although this court does not know how plaintiff intends to prove that defendants' alleged negligence increased the risk of harm to plaintiff, this court can certainly think of possible evidence that could prove that the physical presence of one or more of the faculty supervisors with plaintiff at the Peruvian medical clinic could have changed the outcome in this case. Furthermore, whether defendants' negligence increased the risk of harm to plaintiff is a causation question, and questions regarding

causation are almost always questions for the jury. See *e.g., Bleman v. Gold,* 431 Pa. 348, 246 A.2d 376 (1968). With respect to defendants' superseding cause issue, making a determination of whether someone's negligence is a superseding cause involves several genuine issues of material fact. Section 448 of the Restatement (Second) of Torts, entitled "Intentionally tortious or criminal acts done under opportunity afforded by actor's negligence;" provides as follows:

"The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime." See Restatement (Second) of Torts §448 (1965).

For example, in the present case, the jury would have to determine whether, at the time of the allegedly negligent conduct of the faculty supervisors, the faculty supervisors realized or should have realized that (1) "abandoning" plaintiff in the Peruvian medical clinic was likely to create a situation whereby the male Peruvian doctors could take sexual advantage of a young American female, and (2) the male Peruvian doctors might avail themselves of the opportunity to commit such a tort and/or crime.

### D. *The Consent Form Is Not a Waiver of Liability Form*

Finally, defendants contend that the consent form that plaintiff was required by Thiel College to sign is some-

how another waiver of liability form. The relevant language from the consent form, as executed by plaintiff, is as follows:

"On rare occasions, an emergency requiring hospitalization and/or surgery develops. Laws and regulations vary in foreign countries regarding those instances in which the consent of a parent/guardian/spouse is required in order for a student to be administered an anesthetic or have surgery. Therefore, we request that parent/guardian/spouse sign the following statement to prevent a dangerous delay, if an emergency should occur, and we are unable to contact the parent/guardian/spouse. Such emergencies are rare; however, we want to observe the utmost precautions for the welfare of each participant. Circumstances permitting, students will also be asked to sign a standard consent to surgery form should surgery be required.

"In the event of sickness or injury of my/our/daughter/son/ward/spouse/myself, *Amy L. Fay* (name of student), who is *22* years of age, birthday *November 5, 1973,* I/we hereby authorize the representative abroad of Thiel College to secure whatever treatment is deemed necessary, including the administration of an anesthetic and surgery." See consent form, exhibit D to defendants' brief in support of motion for summary judgment. (The italicized portions represent blanks that were filled in by plaintiff.)

Defendants assert that the "intention of the defendants in having plaintiff and the other students sign the medical consent form before leaving on the trip was to be free from liability if the defendants needed to make medical

decisions for the students while in Peru." See defendants' brief in support of motion for summary judgment at unnumbered page 11.

This argument is clearly without merit. Nowhere in the consent form do the words "waiver," "release," or "waiver of liability," or any other words of similar import and effect appear. As discussed earlier, a waiver of liability form "'must spell out the intention of the parties with the greatest of particularity' . . . and show the intent to release from liability 'beyond doubt by express stipulation' and '[n]o inference from words of general import can establish it.'" *Employers Liability Assurance Corp. v. Greenville Business Men's Association,* 423 Pa. at 292, 224 A.2d at 623. (citations omitted) The consent form does *not* spell out, with the greatest of particularity and by express stipulation, the intention of the parties to release Thiel College from any liability stemming from any medical decisions that one or more of the faculty supervisors made on behalf of, or in conjunction with, a student while participating in the Thiel-sponsored study abroad trip to Peru. The consent form is an unsophisticated health care power-of-attorney from plaintiff in favor of defendants. It is *not* also, however, a waiver of liability form.

An appropriate order follows.

### ORDER

And now, December 31, 2001, and for the reasons set forth in the foregoing opinion, it is hereby ordered that defendants' motion for summary judgment is denied.